UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

IN RE:

COLLIN D. CASCIANO,                                    Case No. HT 12-09912
                                                       Chapter 7 Proceeding
        Debtor.                                        Hon. Daniel S. Opperman
_____/

NATHAN J. JUETT,

        Plaintiff,

v.                                                     Adversary Pro. No. 13-80005

COLLIN D. CASCIANO,

        Defendant.
_____/

OPINION AND ORDER AFTER TRIAL

PRESENT:    HONORABLE DANIEL S. OPPERMAN
            United States Bankruptcy Judge

INTRODUCTION

Nathan Juett (the "Plaintiff"), suffered an orbital blow out fracture, multiple broken nasal bones, internal nerve damage, and brain damage as a result of a punch to his face by Collin Casciano (the "Defendant").   Because of this punch, the Plaintiff seeks to have any debt owed to him by the Defendant excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).   While Mr. Casciano admits striking the Plaintiff, he denies that any obligation that he may owe Mr. Juett should be excepted from discharge.   The Court held a trial in this matter on March 12 and March 13, 2014, and heard the testimony of Jodi Lindgren, Meredith McNabb, Edwin Skiera, the Plaintiff, the Defendant, William Bustance, Jonathan Crispin, and Garrett Petterson.   The Court also received into evidence the deposition of Matthew Smith, M.D., as well as Exhibits 1-5 for

1

the Plaintiff and Exhibits A-C for the Defendant.

The Court bases its findings of fact upon the consideration of the demeanor of the witnesses, their testimony, the Exhibits, and makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52 applicable in this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.

For the reasons stated in this Opinion, the Court finds and concludes that the Defendant did not act in such a manner as to warrant the exception to discharge of any obligation he may owe the Plaintiff.

## FINDINGS OF FACT

### Participants

The following individuals were involved in one way or another with the incident that occurred on January 29, 2011,[1] outside of a bar commonly known as Bootlegger's in downtown Traverse City.

### Nathan Juett

The Plaintiff received a Bachelor's Degree from Grand Valley State University and a Law Degree from Thomas M. Cooley Law School and is a member of the Michigan Bar. Around the time of the incident, the Plaintiff had opened a solo practice in Traverse City. At the time of the incident, he was with his girlfriend, Jodi Lindgren, and her cousin, Meredith McNabb. The Plaintiff played hockey in high school and at the time of the incident was 6 feet tall and weighed 230-235 pounds.

---

[1]The individuals in this proceeding were all at Bootleggers beginning the evening of January 28, 2011, and into the early morning hours of January 29, 2011. The events surrounding this incident occurred at approximately 2:00 a.m. on January 29, 2011. For purposes of this Opinion, the Court will refer to January 29, 2011, as the date of the incident.

Collin Casciano

The Defendant is a manager of a local Traverse City area restaurant and was with Garrett Petterson and Jonathan Crispin on January 29, 2011.  The Defendant is 5'11" and weighed between 170-175 pounds at the time of the incident.

Jodi Lindgren

Jodi Lindgren is the girlfriend of the Plaintiff and was at Bootleggers on January 29, 2011, with her cousin, Meredith McNabb, and the Plaintiff.

Meredith McNabb

Meredith McNabb is the cousin of Jodi Lindgren and was at Bootleggers on January 29, 2011.

Garrett Petterson

Garrett Petterson was with his friends, the Defendant and Jonathan Crispin, in Bootleggers on January 29, 2011.  Mr. Petterson initially engaged Ms. Lindgren and Ms. McNabb in a conversation and sought to continue that conversation after he left Bootleggers.

Jonathan Crispin

Jonathan Crispin is a friend of Garrett Petterson and was with Mr. Petterson and the Defendant at Bootleggers on January 29, 2011.

Edwin Skiera

Edwin Skiera was a bartender at Bootleggers and witnessed the events outside Bootleggers on January 29, 2011.

Events Inside Bootleggers on January 29, 2011

The Defendant, Mr. Petterson, and Mr. Crispin went to Bootleggers between 9:00 p.m. and 10:00 p.m. on January 28, 2011, and were drinking alcohol and interacting with other

3

patrons of Bootleggers.   Three of those patrons were the Plaintiff, Jodi Lindgren, and Meredith McNabb, who visited other bars that night and arrived at Bootleggers between midnight and 2:00 a.m. on January 29, 2011.   The Plaintiff and Ms. Lindgren decided that Ms. McNabb could use a night out of her house because she was recently divorced.   While at Bootleggers, the Plaintiff left Ms. Lindgren and Ms. McNabb for a few minutes to go to the bathroom and Mr. Petterson and the Defendant decided to approach the two women.   After talking to them for a few minutes, the Plaintiff returned and, at the very least, placed himself between Mr. Petterson and the Defendant and Ms. Lindgren and Ms. McNabb.   The Defendant viewed the encounter differently in that he testified that the Plaintiff came from behind and pushed him in the back and out of the way before inserting himself between Ms. Lindgren and Ms. McNabb, on one side, and Mr. Petterson on the other.   Per the Defendant, he concluded that he did not want to have any further encounter with the Plaintiff and started to walk away.   Mr. Petterson, however, did not have that feeling and engaged in trash talk with the Plaintiff.   Ms. Lindgren also joined in this exchange, which rose to the point where the employees at Bootleggers requested that Mr. Petterson and his friends, the Defendant and Mr. Crispin, leave the premises.   Mr. Crispin and the Defendant began to move to the back of Bootleggers to retrieve their coats, while Mr. Petterson protested the eviction of himself and his two friends.   These protests were not effective and the three began to move to the back of Bootleggers to retrieve their coats and ready themselves for departure.

In the meantime, the Plaintiff, Ms. Lindgren, and Ms. McNabb concluded that they needed to leave, so they paid their bill and likewise made their way to the back of Bootleggers to retrieve their coats.   Their plan was to leave Bootleggers and go to a location approximately one block away where they had arranged to be driven home.

4

The Court finds that from the testimony of the Plaintiff, the Defendant, Mr. Petterson, and Ms. Lindgren, that they all were intoxicated and their judgment was clouded by alcohol consumption that night.

Description of Bootleggers and Adjoining Area

Per the testimony, Bootleggers is a bar that is narrow, but long and has a front entrance and a rear entrance.   Patrons may access Bootleggers from either the front or the rear, with the front being on Union Street and the rear facing an alley that runs north and south and parallel to Union Street.   This alley in turn intersects with an alley running east and west.   For purposes of this Opinion, important landmarks include the east end of the second alley where a business known as Mode's is located and the west end, which intersects with Union Street.   The Plaintiff, Ms. Lindgren, and Ms. McNabb had made arrangements to meet a car at Mode's and then to be driven home.   Mr. Petterson had an apartment on Front Street and the Defendant and Mr. Crispin had planned on going back to Mr. Petterson's apartment after they left Bootleggers.   In order to reach their respective destinations, the Plaintiff's group would need to go east and the Defendant's group would need to go west.

Rear Entrance of Bootleggers

Patrons of Bootleggers would hang their coats and other winter garments at the rear entrance of Bootleggers and then enter the premises.   As each patron left, they would go to the rear of Bootleggers to retrieve their belongings, and then either exit from the rear or walk back through the establishment to the front entrance.   On January 29, 2011, the Defendant's group decided to retrieve their winter garments and then use the rear exit.   This caused them to meet up with the Plaintiff's group in this area and exit.   Very little was said between each group while in Bootleggers and the Plaintiff's group, that is the Plaintiff, Ms. Lindgren, and Ms. McNabb,

5

left first and started walking north along the rear alley.  The Defendant's group, led by Mr. Petterson, left soon thereafter and were anywhere from 20-30 feet behind the Plaintiff's group. At this time, there was a renewal of the talking between and among the Plaintiff, Ms. Lindgren, and Mr. Petterson.  Edwin Skiera was outside in the alley area waiting for a friend to appear to make some arrangements for the morning.  Mr. Skiera saw the outside incident between and among the participants and did not know any individual prior to the incident.

As they walked north down the alley, the Plaintiff and Ms. Lindgren felt apprehensive about Mr. Petterson's words, as well as the fact that there were three males following them.  Per Mr. Skiera, Mr. Petterson closed some of the gap between him and the Plaintiff's group by the time they reached the second alley.  At that juncture, however, Mr. Petterson, the Defendant, and Mr. Crispin turned left to walk west in order to get to Mr. Petterson's apartment.  The Plaintiff, Ms. Lindgren, and Ms. McNabb turned east, to meet their prearranged vehicle.

During all of this time, there was continued talk between and among the Plaintiff, Ms. Lindgren, and Mr. Petterson.  After each side made their respective turns, Ms. Lindgren reversed herself and went west down the second alley to talk to the Defendant's group.  The Plaintiff followed her.  There is no evidence that either Ms. McNabb or the Defendant were engaged in any of the verbal sparring going back and forth among these individuals. [2]

---

[2] As to the Plaintiff, Ms. Lindgren, and Mr. Petterson in particular, none of these three individuals displayed a discrete choice of words after the initial encounter between Mr. Petterson and Ms. Lindgren and continuing through the rest of the evening.  Charitably, none of these individuals had a high opinion of the other and all would have been sanctioned for violation of civility principles of this Court.  So that the record is complete, however, the Court finds that the Plaintiff repeatedly stated that if a physical altercation occurred he would prevail. Although the Court did not note the specific size of either Mr. Petterson or Mr. Crispin, they physically appeared to be about the same size as the Defendant.  As such, the Court agrees with the Plaintiff's assessment that in any altercation with either the Defendant, Mr. Petterson, or Mr. Crispin, individually or collectively, he would prevail, absent an unusual event.

Ms. Lindgren first reached Mr. Petterson and kicked him in the shin, prompting him to push her back and causing her to fall.   The Plaintiff, sensing a dangerous situation, came to her aid and began, in his words, wrestling with Mr. Petterson, resulting in the Plaintiff ending up on top of Mr. Petterson on the ground.   The Plaintiff soon got Mr. Petterson to be less belligerent. As the Plaintiff was in the course of standing up, he was punched by the Defendant.   This one punch caused the injuries sustained by the Plaintiff.   The Plaintiff knew immediately that the punch he received was severe and he immediately asked for someone to call the police.   Mr. Petterson, the Defendant, and Mr. Crispin left the scene and Ms. Lindgren, Ms. McNabb, and Mr. Skiera tended to the Plaintiff.   The Plaintiff initially refused to be taken to a hospital by ambulance, and instead preferred to have his father drive him to the hospital.   He was able, however, to give a short statement to the police.

Since neither the Defendant, Mr. Petterson, or Mr. Crispin were known to anyone in the Plaintiff's group, they began to inquire and ultimately learned of Mr. Petterson's identity.   He was subsequently interviewed by the police, who noted that he had a swollen lip and some dried blood around his face.

The Defendant was treated by Dr. Matthew Smith, who performed the necessary medical procedures to repair the damage done to the Plaintiff as best he could.   Dr. Smith's testimony, presented in the form of a deposition for trial, detailed the type of blow that the Defendant inflicted upon the Plaintiff and the severity of the damage that would cause this type of injury. As Dr. Smith testified, the injuries sustained by the Plaintiff are consistent with a high speed impact, such as in an automobile accident or a baseball striking a hitter's face.   Dr. Smith also testified that he has seen this type of injury when someone walks into a door or if a passenger on a personal water craft hits the helmet of the driver.   Dr. Smith testified he has not seen this type of injury caused by a punch.

<u>Post January 29, 2011, Events</u>

At trial, William Bustance, a local but nationally known boxing instructor, testified regarding the type of blow that would be necessary to cause the injury sustained by the Plaintiff. In Mr. Bustance's opinion, this injury would be caused by someone who was in a good punching position and the individual receiving the punch who was not aware that the punch was coming such that he could not defend himself.   Mr. Bustance also testified that in his decades of experience in boxing, he has never personally witnessed such an injury.   On cross-examination, he did admit that he heard of similar injuries, including one at the professional fight level.

<u>JURISDICTION</u>

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157, 28 U.S.C. § 1334, and E.D. Mich. LR 83.50.   This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debt).

The issues in this matter arise from Title 11 of the United States Code and do not involve any matter which limits this Court's jurisdiction as detailed by the United States Supreme Court in *Stern v. Marshall*, ---- U.S. ----, 131 S. Ct. 2594, 2608, 180 L.Ed.2d 475 (2011), and later by the United States Supreme Court in *Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165 (2014).   *See also Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012).

<u>RELEVANT LAW</u>

<u>Section 523(a)(6)</u>

Section 523(a)(6) authorizes a bankruptcy court to exclude a debtor from receiving a discharge "from any debt for willful and malicious injury by the debtor to another entity or the property of another entity."   The exceptions to discharge are to be narrowly construed in favor of the debtor.   *Monsanto Co., v. Trantham (In re Trantham)*, 304 B.R. 298 (B.A.P. 6th Cir. 2004) (citing *Meyers v. I.R.S. (In re Meyers)*, 196 F.3d 622 (6th Cir. 1999)); *see also Walker v.*

8

*Tuttle (In re Tuttle)*, 224 B.R. 606, 610 (Bankr. W.D. Mich. 1998) (recognizing "the axiom that requires this court to construe exceptions to the bankruptcy discharge narrowly and in favor of the debtor.") (citing *Kawaauhau v. Geiger*, 523 U.S. 57 (1998)). A party must prove by a preponderance of the evidence that a debtor committed an injury that is both willful <u>and</u> malicious.   *Grogan v. Garner*, 498 U.S. 279 (1991).

In *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), the United States Supreme Court discussed and determined the meaning of the language used in 11 U.S.C. § 523(a)(6).   The issue before the United States Supreme Court involved "whether a debt arising from a medical malpractice judgment attributable to negligent or reckless conduct" fell within 11 U.S.C. § 523(a)(6).   *Id*. at 59.   The Kawaauhaus argued that the malpractice award fell within the Section 523(a)(6) exception because Dr. Geiger engaged in the intentional act of providing inadequate medical services which led to Mrs. Kawaauhau's injury.   *Id*. at 61.

In analyzing the parameters of the language "willful and malicious injury," the United States Supreme Court found that:

> [T]he word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury.   Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury."   Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." . . . [T]he (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts.   Intentional torts generally require that the actor intend "the *consequences of an act," not simply "the act itself.*"

*Id.* at 61-62 (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)).

The United States Supreme Court further determined that to adopt the interpretation proposed by the Kawaauhaus would:

> place within the excepted category a wide range of situations in

> which an act is intentional, but injury is unintended, i.e., neither desired nor in fact anticipated by the debtor. . . .   A "knowing breach of contract" could also qualify.   A construction so broad would be incompatible with the 'well-known guide that exceptions to discharge "should be confined to those plainly expressed.'

*Id*. at 62 (quoting *Gleason v. Thaw*, 236 U.S. 558, 562 (1915)).

More than a year later, the Sixth Circuit Court of Appeals considered the "willful and malicious injury" language contained in § 523(a)(6), in *Markowitz v. Campbell (In re Markowitz),* 190 F.3d 455 (6th Cir. 1999).   The Sixth Circuit Court of Appeals interpreted *Geiger* and noted that:

> [t]he [Supreme] Court's citation to the Restatement's definition of "intentional torts" underscores the close relationship between the Restatement's definition of those torts and the definition of "willful and malicious injury."   The Restatement defines intentional torts as those motivated by a desire to inflict injury or those substantially certain to result in injury.   Although the Supreme Court identified a logical association between intentional torts and the requirements of § 523(a)(6), it neither expressly adopted nor quoted that portion of the Restatement discussing "substantially certain" consequences.

*Id*. at 464.

Based on the language used and analysis of the United States Supreme Court in *Geiger*, the *Markowitz* Court announced the standard of the Sixth Circuit Court of Appeals by holding that:

> unless 'the actor desires to cause [the] consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' he has not committed a "willful and malicious injury" as defined under § 523(a)(6).

*Id*. (quoting Restatement (Second) of Torts § 8A, at    15 (1964)); *see Kennedy v. Mustaine*, 249 F.3d 576, 580 (6th Cir. 2001).

In addition to proving a willful injury, a party must also prove that the debtor committed a malicious injury.   "'Malicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent."   *Wheeler v. Laudani*,

10

783 F.2d 610, 615 (6th Cir. 1986) (citing *Tinker v. Colwell*, 193 U.S. 473, 486 (1904)).   If a party fails to prove either willful or malicious, the debt will be discharged.   *Markowitz*, 190 F.3d at 463.   Inferences can be made, however, if the circumstances surrounding the alleged injury warrant such:

> Determining whether a debtor acted both willfully and maliciously for purposes of § 523(a)(6) requires an examination of that person's state of mind.   A debtor will rarely, if ever, admit to acting in a willful and malicious manner . . . [but] both requirements can be inferred through the circumstances surrounding the [involved] injury.

*O'Brien v. Sintobin (In re Sintobin)*, 253 B.R. 826, 831 (Bankr. N.D. Ohio 2000) (citations omitted).

Subsequently, the Sixth Circuit Court of Appeals re-visited this issue in the case of *Kennedy v. Mustaine (In re Kennedy)*, 249 F.3d 576, 581 (6th Cir. 2001).   In that case, the Sixth Circuit Court of Appeals reiterating the holdings in *Geiger* and *Markowitz*, summarizing the test under Section 523(a)(6) as: "[O]nly acts done with the intent to cause injury–and not merely acts done intentionally–rise to the level of willful and malicious injury for purposes of satisfying § 523(a)(6).".

<u>ANALYSIS</u>

None of the members of the Defendant's group or the Plaintiff's group acted appropriately on the night in question.   The issue before the Court, however, is whether the obligations arising from the Defendant striking the Plaintiff are excepted from discharge under 11 U.S.C. § 523(a)(6).   First, the Court finds that the Defendant, being of a slighter and lighter build than the Plaintiff, had a reason to be concerned for his physical well-being as early as the first encounter with the Plaintiff inside Bootleggers that night.   In particular, the Plaintiff physically placed himself between the Defendant and Ms. Lindgren.   While the Plaintiff downplays the nature of that maneuver, the Defendant walked away with a distinct and clear feeling that the Plaintiff would aggressively protect his girlfriend, Ms. Lindgren, and her cousin,

Ms. McNabb.   This was exhibited not only by his actions, but the words that he used in doing so.   While it is true that there was a potential "cooling off" period from the time that Bootleggers evicted the Defendant's group and the time the Plaintiff's group left Bootleggers, this situation immediately escalated after the two groups left Bootleggers.   Initially, therefore, the Court concludes that the events inside Bootleggers are as relevant as what occurred outside Bootleggers.

The Court will pause and comment upon the Plaintiff's arguments that the Defendant's group intended to stalk the Plaintiff's group by waiting at the back of Bootleggers and then exiting at the same time as the Plaintiff's group.   From a time standpoint, the Plaintiff is absolutely correct.   As argued by the Plaintiff, this all could have been avoided had the Defendant's group merely either left earlier or left through the front entrance, which would be slightly closer to the Defendant's group's ultimate destination anyway.   The Court notes this argument and is slightly troubled by the actions of the Defendant's group.   This is especially true given the subsequent events in which Mr. Petterson continued to engage in trash talking with the Plaintiff and Ms. Lindgren.

Two factors cause the Court to give less weight to the Plaintiff's arguments than he would hope.   First, the Court gives slight weight to the Defendant's arguments that the Bootleggers' employees would not let the Defendant's group go back into the establishment to use the front entrance.   There is no testimony to support this assertion, but there is a slight commonsense weight to give to this argument in that the Plaintiff could likewise argue that the Defendant's group wished to re-engage or escalate the confrontation by going back into the restaurant, instead of exiting through the back door.

More importantly, however, the Court finds that even though there was inappropriate language among Mr. Petterson, the Plaintiff, and Ms. Lindgren as the two groups walked down

12

the one alley, the situation began to cool down when the Defendant's group turned left and the Plaintiff's group turned right.   In this regard, the Plaintiff testified, the Court believes correctly, that he was concerned about the safety of the two women with him, especially given that there were three larger males following them.   As the Plaintiff testified, he merely wanted to get his group away and to the safety of the awaiting car.   Taking all of this as true, the Court is left with the conclusion that after the two groups separated, Ms. Lindgren decided to re-engage and therefore escalate the matter even further by turning and going west to track down the Defendant's group, namely Mr. Petterson.

Also instructive is the lack of involvement of the Defendant after his initial encounter with the Plaintiff.   The majority of the testimony involved statements by Mr. Petterson to Ms. Lindgren and the Plaintiff.   There is scant evidence that the Defendant was involved in this exchange.   Instead, the evidence is that the Defendant was relatively silent during all of this encounter and he only returned back once he saw that Ms. Lindgren had re-engaged the conversation and began striking Mr. Petterson.

The Court does not come to this conclusion easily or lightly, and closely considered the demeanor of the witnesses as they testified and weighed the statements of each witness by comparing those statements with other witnesses and the demeanor of those witnesses.   In that regard, the Court cannot come to a final conclusion as to what actually happened that night, vis-a-vis, the specific action of one party or the other.   In particular, while the Court would normally find that both the Defendant and the Plaintiff and their respective companions have slightly different views of the matter, the testimony of Mr. Skiera is instructive.   While the Plaintiff argues that he was defenseless when the Defendant hit him, the direct testimony of Mr. Skiera is more consistent with that of the Defendant.

From all of this, the Court finds that the Defendant had sufficient reason to believe that

13

not only was the Plaintiff able to physically harm him, as evidenced by the first encounter between the two, but that given what he saw with Mr. Petterson and the Plaintiff, namely the Plaintiff taking Mr. Petterson down relatively easily and forcing him into submission, that the Plaintiff was going to look for the Defendant next.

Moreover, the Defendant's state of mind at this point was devoid of the requisite knowledge or intent as required by 11 U.S.C. § 523(a)(6). First, the Defendant testified that he had no fight experience and essentially did not know what he was doing that night. Second, while it is clear that the Defendant intended to punch the Plaintiff, there is not the necessary nexus between the punch and the consequences of the act. There is no evidence that the Defendant knew that punching the Plaintiff in this location on his face would cause the resulting injury to ensue, if any. Further, the evidence is that the Defendant threw only one punch and did not inflict any other blows upon the Plaintiff. While the Defendant undoubtedly thought that his one punch would slow the Plaintiff down, there is no evidence that he believed that the effect of the one punch would be anymore than that, and certainly not the type of injury that it caused. In that regard, the testimony of both Mr. Bustance and Dr. Smith collaborates this conclusion.

Finally, the record does not clearly establish that the Defendant committed a malicious injury. While the Court acknowledges that every individual owes another individual the duty not to assault that individual, in this case, the Defendant was placed in a position of having to defend himself, thus forming just cause. Again, there is insufficient evidence that the Defendant knew his act would cause injury, much less the type of injury suffered by the Plaintiff. While the Plaintiff's injuries are horrific, the Court cannot link these injuries to the intent standards of Section 523(a)(6).

Taken as a whole, the Court concludes that the Plaintiff has failed to show by a

14

preponderance of the evidence the necessary elements of an 11 U.S.C. § 523(a)(6) claim.

<u>CONCLUSION AND ORDER</u>

For the reasons stated in this Opinion, the Court finds that the obligation owed by the Defendant, Collin Casciano, to the Plaintiff, Nathan Juett, is dischargeable.

NOW, THEREFORE, IT IS HEREBY ORDERED that the obligation owed by the Defendant, Collin Casciano, to the Plaintiff, Nathan Juett, is dischargeable.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Opinion and Order After Trial pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Carroll Clough, Michael I. Conlon, and Paul I. Bare.

**Signed: September 5, 2014**



Hon. Daniel S. Opperman
United States Bankruptcy Judge