UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

IN RE:

COLLIN D. CASCIANO,                                      Case No. 12-09912
                                                        Chapter 7 Proceeding
            Debtor.                                     Hon. Daniel S. Opperman
_____/

NATHAN J. JUETT,

        Plaintiff,

v.                                                      Adversary Pro. No. 13-80005

COLLIN D. CASCIANO,

        Defendant.
_____/

OPINION ON REMAND REGARDING COURT'S SEPTEMBER 5, 2014,
OPINION AND ORDER AFTER TRIAL

PRESENT:   HONORABLE DANIEL S. OPPERMAN
           United States Bankruptcy Judge

On September 5, 2014, this Court entered an Opinion and Order after Trial ("Trial Opinion"), holding that Plaintiff had not met his burden of proof and determining that the underlying debt owing to Plaintiff by Defendant was dischargeable. Plaintiff Nathan Juett filed a motion for rehearing/reconsideration of the Trial Opinion. This Court denied that motion after hearing in an Opinion and Order dated March 13, 2015. Plaintiff appealed that decision to the Bankruptcy Appellate Panel ("BAP"), which issued its Opinion on January 11, 2016, reversing this Court's decision that Defendant's actions were not "willful" under Section 523(a)(6), and

remanding this matter to determine the malicious element under applicable Michigan law, specifically, the Michigan Self-Defense Act, M.C.L.A. § 780.971 *et seq.* ("MSDA"). Specifically, the MSDA states that self-defense may be found "if he or she honestly and reasonably believes that the use of that force is necessary to defend himself or herself or another individual from the imminent unlawful use of force by another individual." M.C.L.A. § 780.972(2). Plaintiff filed a Motion to Remand this matter to the state court to make this self-defense determination, which this Court denied in an Opinion and Order dated July 21, 2016.

This Court did not analyze its factual findings under the Michigan Self-Defense Act in its September 5, 2014, Trial Opinion, which is the sole issue on remand from the BAP. This Court concluded in its July 21, 2016, Opinion and Order denying Plaintiff's Remand Motion that the factual record is complete, and further proofs are not necessary, but ordered the parties to brief this limited issue by reference to the record, which may not go beyond its factual findings in the September 5, 2014, Opinion and Order. Briefs have been filed, and the Court now issues its decision on remand.

Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157(a) and E.D. Mich. LR 83.50. This is a core proceeding under 28 U.S.C. § 157(b)(2)(l) (determinations as to the dischargeability of particular debts).

Relevant Findings and Conclusions of the Sixth Circuit Bankruptcy Appellate Panel

The BAP entered its Opinion and Judgment reversing and remanding this matter to this Court on January 11, 2016. The BAP first held that this Court's factual findings were based on its determinations as to the credibility of witnesses, and "were not unreasonable, were supported

by the trial testimony, and will not be overturned as clearly erroneous." *Juett v. Casciano (In re Casciano),* No. 15-8013, slip op. at 9 (B.A.P. 6th Cir. Jan. 11, 2016). The BAP concluded, however, that this Court erred in finding that Defendant's actions were not willful under Section 523(a)(6). The BAP reversed this Court's conclusion that because Defendant did not intend to cause the specific injury Plaintiff ultimately sustained, his action in punching Plaintiff was not willful. *Casciano*, slip op. at 10-11. As to the element of malice, the BAP concluded that a finding of self-defense on remand may "negate" a finding of malice. On this point, the BAP held that both the MSDA and federal self-defense law as cited by federal courts from the Restatement (Second) of Torts are substantively similar, specifically stating:

> Both allow the use of non-lethal force if honestly and reasonably believed to be necessary to repel an imminent attack, even if retreat is possible.

> However, the BAP concluded that this Court's factual findings were not analyzed under

applicable self-defense law:

> The bankruptcy court made numerous factual findings regarding the parties' conduct on the evening in question that relate to the Debtor's claim of self-defense. However, the bankruptcy court did not analyze these actions under applicable law on self-defense or determine if the Debtor met his burden of proof on that issue. For this reason, the Panel must remand the matter to the bankruptcy court for further proceedings regarding the element of "malicious injury" under § 523(a)(6) and Debtor's claim of self-defense.

*Casciano*, slip op. at 13.

Thus, the BAP had determined, that while this Court's factual findings were not clearly erroneous, its application of those facts to the "willful" element of Section 523(a)(6) was erroneous, and Defendant's actions were, indeed, willful. The BAP also determined that the "malicious" element, however, could be negated upon application of these factual findings under the MSDA.

Analysis and Conclusion on Remand

Upon consideration of the Briefs on Remand filed by Plaintiff and Defendant, the Court analyzes the issue on remand.   The starting point is the language of the MSDA, which states that self-defense may be found "if he or she honestly and reasonable believes that the use of that force is necessary to defend himself or herself or another individual from the imminent unlawful use of force by another individual."   M.C.L.A. § 780.972(2).   Because the claim of self-defense is an affirmative defense to this Section 523(a)(6) action, Defendant carries the burden of proof in establishing the elements have been met.   *Kleman v. Taylor (In re Taylor)*, 322 B.R. 306, 309 (Bankr. N.D. Ohio 2004).   The Court begins with the findings of fact made in its Trial Opinion as relevant to the findings required under the MSDA.

As to Defendant's actions, inactions and words prior to the punch, the Court found:

> Also instructive is the lack of involvement of the Defendant after his initial encounter with the Plaintiff.   The majority of the testimony involved statements by Mr. Petterson to Ms. Lindgren and the Plaintiff.   There is scant evidence that the Defendant was involved in this exchange.   Instead, the evidence is that the Defendant was relatively silent during all of this encounter and he only returned back once he saw that Ms. Lindgren had re-engaged the conversation and began striking Mr. Petterson.

> * * * *

> From all of this, the Court finds that the Defendant had sufficient reason to believe that not only was the Plaintiff able to physically harm him, as evidenced by the first encounter between the two, but that given what he saw with Mr. Petterson and the Plaintiff, namely the Plaintiff taking Mr. Petterson down relatively easily and forcing him into submission, that the Plaintiff was going to look for the Defendant next.

> . . . .   While the Defendant undoubtedly thought that his one punch would slow the Plaintiff down, there is no evidence that he believed that the effect of the one punch would be anymore than that, and certainly not the type of injury that it caused.

> . . . .   While the Court acknowledges that every individual owes another individual the duty not to assault that individual, in this case, the Defendant was placed in a position of having to defend himself, thus forming just cause.

(Trial Opinion, at 13-14).

Further, the Court has reviewed the citations to the Trial Transcript from the March 12 and March 13, 2014, trial dates in both Plaintiff's and Defendant's Briefs on Remand, and finds the following additional, relevant testimony of Defendant:

Q     What happened next?

A     At that point, Juett got on top of Garrett, and stayed on top of him.

Q     In what posture?

A     Kinda like a straddling posture.

Q     Kneeling over him?

A     He was–Juett was sitting right on top of Garrett–235 pounds right on top of Garrett so that Garrett couldn't get up off the ground.

Q     Sitting on like his waist or his chest?

A     His waist region, yeah.

Q     And was Peterson calling for help?

A     No.

Q     And then what was Nate doing while he was in that posture?

A     Instantly, after they went down to the ground, after Nate took him down to the ground, I saw Nate Juett swing with his right (demonstrating) and then his left across Garrett's face, and then take his right forearm a third time for an impact.   And then at that point, he had popped up off Garrett and turned in my direction.

Q     So you're gesturing in the witness stand or witness box a roundhouse right swing by Nate Juett who is sitting on Mr. Peterson at the time, and then a roundhouse left as he's sitting on him.

A     Yeah.   It was kind of like–it was kind of like how–I used to watch the hockey fights.   It was kind of like this, this, and then that (demonstrating).

Just like that.

Q    And did he put weight behind this?

A    Oh, yeah.   Yeah.   It was vicious.

MR. CONLON: Your Honor—okay.

A    They're all laughing, but I'm serious.   It was vicious.

BY MR. PARSONS:

Q    Okay.   And then Mr. Peterson didn't call for help, didn't do anything?

A    No.

Q    And then Mr. Juett, you said–what did he do next?

A    After he hit Garrett?

Q    Yeah.

A    Okay.   At that point, he had popped up kinda like an adrenalin pop, like he wanted to do something else.   And then he had turned in my direction. And I was staying away from this scene.

Q    You're still kinda to the northwest?

A    Northwest.   Yeah.   And he–

Q    Five to seven feet away?

A    Yeah.   Yeah.   I would say so.   And then at this point, Juett had popped up, like I said, turned into this direction and was leaning in towards me just like that, face-to-face, eye-to-eye.   I looked into his eyes.

Q    And–okay.   So what's the story of why you hit him?   Were you afraid for what he was doing to Mr. Petterson?   Were you revenging what he did to Mr. Petterson?   Or you were afraid for what he was going to do to you?

A    I was afraid of the fact what–I was afraid of the fact that–well, not the fact, but I was afraid that Juett was going to come after and attack me after what I saw him do to Garrett, and after what I heard him say before and he attacked Garrett.   So that's why I hit him.   I was very scared.   Like I said,

never threw a punch before in my life.  Didn't know what I was doing.  And–and–

Q   What did you intend to do when you hit–when you swung?

A   I intended to get him away from me.

Q   Okay.   And did you aim at anything?

A   I just aimed at his head.

Q   Why at his head?

A   Because I wanted him to stop.   That felt like if I would have punched him in the chest or the arm, I think he would have came after me.

Q   Did you think you were going to be able to stop him with a punch?

A   I didn't know that.  I felt like that's exactly what I needed to do at that point.   I did not know if it was going to stop him.   To be honest with you, once I hit him, I actually kinda backed up a little bit in case of the fact that he was going to come after me again.   That's kinda what I thought was going to happen.   So–and then–and then I realized he went down to his knee, grabbed his eye, and then–

Q   You didn't see any blood?

A   No.   I never saw blood.

Q   And Mr. Skiera, the eye witness who said there was a pool of blood almost immediately, you didn't see any of that?

A   No, I did not.

Q   And did you hear Mr. Juett say, "Somebody call the cops?"

A   No.   Never.

Q   And did you run from the scene?

A   No, I never ran.  We walked because Garrett was in such a haze from hitting his head on the ground.   I was kind of worried about him, so I kind of took it slow.

(Trial Transcript, at 234-38).

As applied to the MSDA, the factual record and factual findings of this Court support a finding that Defendant honestly and reasonably believed that the use of force by punching Plaintiff was necessary to defend himself, as well as defend Mr. Petterson, from the imminent, unlawful use of force by Plaintiff.   Defendant's testimony at trial was that when Plaintiff "popped up" after attacking Garrett Peterson, and turned in Defendant's direction.   Defendant honestly and reasonably believed force was necessary to defend himself, as well as potential future attacks upon Mr. Peterson.   This belief was not made by the mere words of Plaintiff, but also by Plaintiff's actions at that time.   Defendant credibly testified as to this belief, as quoted above, and such testimony as to Defendant's state of mind was not proven false.   While both Plaintiff and Defendant point this Court to testimony at trial concerning the background prior to the circumstances directly surrounding Defendant punching Plaintiff, the Court finds Defendant's testimony as quoted above to be the most credible and relevant as to the MSDA.

Accordingly, this Court concludes that under the MSDA, Defendant has carried his burden in proving that he acted in self-defense, and with just cause, effectively negating the element of malice required for a finding of nondischargeability under Section 523(a)(6).

The Court will enter a separate order consistent with this Opinion.

[END OF ORDER]

**Signed: March 24, 2017**



Daniel S. Opperman
Hon. Daniel S. Opperman
United States Bankruptcy Judge